IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

WILLIE L. HUFF                                                                          PLAINTIFF

                    v.                          Civil No. 6:07-cv-06013

CAPTAIN MEL STEED,
Garland County Detention Facility;
CPL. HOAR, Garland County
Detention Facility; and NURSE
TOMMY HARMON                                                                    DEFENDANTS

## <u>OPINION</u>

The plaintiff, Willie L. Huff, (hereinafter "Huff" or "Plaintiff") filed this civil rights action

pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Huff is currently incarcerated in the Arkansas Department of Correction.  The events at issue

in this lawsuit occurred while he was incarcerated at the Garland County Detention Facility (GCDF).

Huff contends his constitutional rights were violated in two ways during his incarceration at

the GCDF.  First, Huff contends he was denied adequate medical care.  Second, Huff contends he

was subjected to unconstitutional conditions of confinement.  Specifically, he contends he was:  (a)

not screened for tuberculosis; (b) not allowed to have a family member provide him with certain

items of personal property authorized by the jail rules; and (c) provided with a meal containing

rodent droppings.

Defendants filed a summary judgment motion (Doc. 15).  To assist Huff in responding to the

summary judgment motion, a questionnaire was propounded (Doc. 18) by the Court.   Huff filed a

response to the questionnaire (Doc. 19).  The motion is before me for disposition pursuant to the

consent of the parties (Doc. 13).

-1-

## 1. Background

Huff was booked into the GCDF on November 30, 2006, on pending criminal charges. *Plaintiff's Response* (Doc. 19)(hereinafter *Resp.*) at ¶ 1; *Defendants' Exhibit* A (hereinafter *Defts' Ex.*). He remained incarcerated there until May 3, 2007, when he was released on bond. *Resp.* at ¶ 2; *Defts' Ex.* A.

Captain Mel Steed is the jail administrator at the GCDF. *Resp.* at ¶ 4; *Steed's Affidavit* at ¶ 4. Tommy Harmon is a nurse employed at the GCDF. *Resp.* at ¶ 5; *Steed's Aff.* at ¶ 4. Dr. Kevin Hale is a medical doctor with a private practice located in Hot Springs, Arkansas. *Resp.* at ¶ 7; *Steed's Aff.* at ¶¶ 6-8. Dr. Hale is not an employee of Garland County but does, pursuant to an agreement with the county, see inmates in the custody of the GCDF. *Id.* Dr. Hale is paid on a per patient basis. *Id.*

Garland County has a policy requiring the provision of medical care to inmates. *Resp.* at ¶ 8; *Steed's Aff.* at ¶ 9. When an inmate is in need of non-emergency medical care, the inmate is required to complete a medical request form. *Id.* The medical request form is reviewed by a supervisor and then forwarded to Dr. Hale for review. *Id.*

If the decision is made that the inmate needs to see a doctor, the inmate is scheduled an appointment with Dr. Hale at his regular visit. *Resp.* at ¶ 9; *Steed's Aff.* at ¶ 9. Dr. Hale sees inmates at the GCDF at least once a week. *Steed's Aff.* at ¶ 9.

All directions given by Dr. Hale regarding prescription medication, referrals, x-rays, etc., are complied with by the staff at the GCDF. *Resp.* at ¶ 11; *Steed's Aff.* at ¶ 9. If an inmate needs emergency medical care, the inmate is either transported to the emergency room or an ambulance is summoned to provide emergency medical care. *Resp.* at ¶ 12; *Steed's Aff.* at ¶ 9.

Huff was seen by Dr. Hale on November 30, 2006. *Resp.* at ¶ 13(A); *Defts' Ex.* C. He diagnosed Huff as having hypertension or high blood pressure and prescribed Maxzide. *Id.* Huff began receiving the prescribed medication on December 1st. *Resp.* at ¶ 13(B); *Defts' Ex.* D.

Huff submitted his first medical request on January 2, 2007. *Resp.* at ¶ 14; *Defts' Ex.* B at page 1. He complained of a head cold and "asthma sneezing runny nose difficult breathing." *Id.* Nurse Harmon reviewed Huff's medical request and gave him two Tylenol and one cold tablet. *Resp.* at ¶ 15(A); *Defts' Ex.* B at page 1. Huff received the medication three times a day for four days. *Resp.* at ¶ 15(B); *Defts' Ex.* D at page 3.

Huff submitted a grievance on January 4th in which he stated the inmate rules authorized inmates to have three pair of undershorts, three t-shirts, three pair of socks, and one thermal top. *Resp.* at ¶ 41; *Defts' Ex.* F at page 1. However, these items were not issued by the county. *Id.* Huff stated as an indigent inmate he did not have a fair and adequate opportunity to obtain underwear, socks and warmer clothing. *Id.* He stated the rules did not say these items must be purchased from the commissary and could not be "received." *Id.* In response, he was told no action would be taken on the grievance because it was not signed. *Id.*

On January 9th, Huff submitted a second medical complaint stating he had a runny nose, his nostrils were stopped up, and he was having difficulty breathing. *Resp.* at ¶ 16; *Defts' Ex.* B at page 2. Huff's request was reviewed by Nurse Harmon that day and he authorized Huff to have two Tylenol tablets and one cold tablet. *Resp.* at ¶ 17(A); *Defts' Ex.* B at page 2. Huff received two Tylenol tablets and one cold tablet on January 10th through January 13th at 9:00, 17:00 and 21:00. *Resp.* at ¶ 17(B); *Defts' Ex.* B at page 4.

-3-

On January 15th, Huff submitted another medical complaint stating he had a cold and his nose was running. *Resp.* at ¶ 18; *Defts' Ex.* B at page 3. Huff also indicated he was having difficulty breathing and was out of Albuterol. *Id.* He stated he would love to see Dr. Hale. *Id.*

Huff's request was reviewed by Nurse Harmon on January 17th. *Resp.* at ¶ 19(A); *Defts' Ex.* B at page 3. He authorized Huff to have two Tylenol and one cold tablet. *Id.* Huff received the medication three times a day for five days. *Resp.* at ¶ 19(B); *Defts' Ex.* D at page 4.

On January 25th, Huff submitted a medical complaint stating that three weeks was too long. *Resp.* at ¶ 20; *Defts. Ex.* 3 at page 5. Huff indicated every time he sneezed or blew his nose he had blood coming out. *Id.* He stated he had a stuffy head, difficulty breathing, coughing, and a runny nose. *Id.* He stated he needed some help. *Id.* He asked for cough drops or peppermints. *Id.* In response, Nurse Harmon stated that Huff's Albuterol inhaler was received too early to re-order. *Resp.* at ¶ 21; *Defts' Ex.* B at page 5. He also noted that he had put Huff on numerous cold set-ups. *Id.*

On February 3rd, Huff submitted a grievance form stating he had been writing since December 4, 2006, about not receiving a tuberculosis (TB) skin test and there being no ultraviolet (UV) lights in cell block 1D. *Resp.* at ¶ 42(A); *Defts' Ex.* F at page 2. He also stated he had been writing about the personal property that was authorized, but not issued by the county, undershorts, t-shirts, socks and a thermal shirt. *Id.* In response, Huff was told he could purchase the items mentioned at the commissary and if he didn't have any money to see the Chaplain for help. *Resp.* at ¶ 42(B); *Defts' Ex.* F at page 2. If he had a medical problem he was told he needed to see the doctor or nurse but first he had to send a medical request to the nurse. *Id.* Huff had no reason to believe he had been exposed to TB. *Resp.* at ¶ 43.

-4-

On February 5th, Huff submitted a medical complaint stating that he was not given a TB skin test during the time he was booked into the GCDF. *Resp.* at ¶ 22; *Defts' Ex.* B at page 6. Huff indicated he was concerned about his health. *Id.* He also stated there were no UV lights in the cell block, 1-D. *Id.* In response, Nurse Harmon said: "Get a life–3 from the same 1D cells wrote the same thing. There is no reason for this except you & other wants to complain." *Resp.* at ¶ 23; *Defts' Ex.* B at page 6.

Huff next requested medical treatment for chest pain when coughing, high fever, runny nose, aching body, and watering eyes. *Resp.* at ¶ 24; *Defts' Ex.* B at page 7. He also asked if his blood pressure could be checked. *Id.* Nurse Harmon responded on February 6th by giving Huff two Tylenol and one cold tablet three times a day for five days. *Resp.* at ¶ 25(A); *Defts' Ex.* B at page 7. Huff received the medication.

On February 16th, Huff submitted a medical complaint asking for his asthma inhaler. *Resp.* at ¶ 26; *Defts' Ex.* B at page 8. Nurse Harmon responded on February 20th noting that Huff's inhaler had been ordered. *Resp.* at ¶ 27; *Defts' Ex.* B at page 8.

On February 28th, Huff submitted a medical request stating he had been sneezing, his nose running, and when he blew his nose there was blood. *Resp.* at ¶ 28; *Defts' Ex.* B at page 9. Huff stated he knew he was getting a cold and would like a cold set up before it got worse. *Id.* He also stated he wanted his weight checked. *Id.* On March 1st, Nurse Harmon authorized Huff to have two Benadryl and one cold tablet three times a day for five days. *Resp.* at ¶ 29(A); *Defts' Ex.* B at page 9. Huff received the medication. *Resp.* at ¶ 29(B); *Defts' Ex.* D at pages 6-7.

On March 19th, Huff submitted a grievance stating that at breakfast time there was "rat shit" in his gravy. *Resp.* at ¶ 44(A); *Defts' Ex.* F at page 3. He stated this was a major health issue. *Id.*

He said he did not want anymore gravy and bread for breakfast.  *Id.*  He asked that something be done.  *Id.*  In response, Huff was told there was no mouse problem at the GCDF.  *Resp.* at ¶ 44(B); *Defts' Ex.* B at page 3.  He was told no rats had been seen there.  *Id.*  He was told the gravy was a country gravy with black pepper in it and spices from the sausage.  *Id.*  He was told to show the "turd" to someone so he could see the difference between a turd and spices.  *Id.*  March 19th was the only time he found "rat droppings" or similar items in his food.  *Resp.* at ¶ 44(C).

On March 23rd, Huff submitted a medical request stating he was sneezing, had a runny noise and coughing.  *Resp.* at ¶ 30; *Defts' Ex.* B at page 10.  In response, Huff was given two Aleve and one cold tablet three times a day for five days.  *Resp.* at ¶ 31(A); *Defts' Ex.* B at page 10.  Huff received the medication.  *Resp.* at ¶ 31(B); *Defts' Ex.* D at page 9.

On April 6th, Huff submitted a medical complaint in which he stated he had requested medical during the week of March 26th, for a runny nose, head cold, stuffiness, sneezing.  *Resp.* at ¶ 32; *Defts' Ex.* B at page 11.  He stated he was miserable and would like to have some medical so he could rest.  *Id.*  In response, Huff was told he evidently had a short memory because he had been given a number of set ups.  *Resp.* at ¶ 33(A); *Defts' Ex.* B at page 11.  Huff was given Aleve and a cold tablet three times a day for five days.  *Id.*  He received the medication.  *Resp.* at ¶ 33(B); *Defts' Ex.* D at page 10.

On April 10th, Huff submitted a grievance stating the TV had been found on VH1 and this violated the rules and regulations.  *Resp.* at ¶ 45(A); *Defts' Ex.* F at page 4.  He stated the rules said the jail captain would pull the TV and it would not be returned until the jail captain approved it.  *Id.*  He asked why he was being locked down and the TV was still in the barracks.  *Id.*  He also asked if his shower privileges were taken as well.  *Id.*  In response, Huff was told the jail captain had said

he was being put on lock down.  *Resp.* at ¶ 45(B); *Defts' Ex.* F at page 4.  When Huff was given a disciplinary and loss of privileges, he was told he only got to shower twice a week and not daily. *Id.*

On April 16th, his inhaler ran out.  *Resp.* at ¶ 34(A); *Defts' Ex.* B at page 12.  On April 16th, Huff told the deputies if he had Primatine tablets instead that would get him through the night until his inhaler could be refilled.  *Resp.* at ¶ 34(C); *Defts' Ex.* B at page 12; *Defts' Ex.* D at page 11.  The tablets were purchased for him and given to him for his use.  *Id.*

On April 18th, Huff submitted a grievance asking if any staff members had received a TB shot in the past two weeks.  *Resp.* at ¶ 46(A); *Defts' Ex.* F at page 5.  If so, he asked why he hadn't been tested.  *Id.*  In response, Huff was told a TB screen was done but inmates were not tested.  *Id.* at ¶ 46(B); *Defts' Ex.* F at page 5.

On April 28th Huff submitted a medical complaint stating he was just about out of his Albuterol inhaler.  *Resp.* at ¶ 35; *Defts' Ex.* B at page 13.  He stated his nose was running and he didn't want to catch a cold.  *Id.*    In response, Nurse Harmon said an inhaler would be ordered. *Resp.* at ¶ 36; *Defts' Ex.* B at page 13.  However, he noted that the inhalers were supposed to last two weeks or more.  *Id.*

Huff received his Albuterol inhaler throughout his incarceration at the GCDF.  *Resp.* at ¶ 37; *Defts' Ex.* D & *Defts' Ex.* E.  He was allowed to keep the inhaler in his cell with him.  *Resp.* at ¶ 34(B); *Defts' Ex.* D at page 1. He received Maxzide throughout his incarceration at the GCDF.  *Resp.* at ¶ 39; *Defts' Ex.* D & *Defts' Ex.* E.

Huff received all medication prescribed to him by Dr. Hale or Nurse Harmon.  *Resp.* at ¶ 39. All decisions regarding his medical care or treatment were made by Dr. Hale and Nurse Harmon.

*Resp.* at ¶ 40.

Huff was asked to explain in detail how he believed Nurse Harmon exhibited deliberate indifference to his serious medical needs.  He did not respond.  *Resp.* at ¶ 47.

Huff was asked if he suffered any physical injury as the result of a delay in his receiving medical attention while he was at the GCDF.  He responded yes.  *Resp.* at ¶ 48.  If he answered yes, he was asked to state what physical injury he suffered, to describe the symptoms he experienced, the severity of those symptoms and how long it took him to recover.  Huff did not respond.  *Id.*

With respect to his allegation that other inmates were allowed to receive personal whites such as underwear, t-shirts, and socks from their family members and he was not, Huff was asked to state the following:  (a) the dates the other inmates received their personal whites from family members; (b) how he knew the other inmates received their personal whites from family members; (c) when the GCDF rules changed requiring inmates to purchase personal whites at commissary; and (d) whether he was able to obtain his personal whites through the commissary or with the assistance of the Chaplain.  Huff did not provide the court with any of the requested information.  *Resp.* at ¶ 49.

Huff was asked to explain how the fact that he could not receive his personal whites from a family member violated his federal constitutional rights.  Huff did not respond.  *Resp.* at ¶ 50.

Huff was asked to explain in detail how he believed Captain Mel Steed violated his federal constitutional rights.  Huff did not respond.  *Resp.* at ¶ 51.

Huff was asked to explain in detail how he believed Corporal Hoar violated his federal constitutional rights.  Huff did not respond.  *Resp.* at ¶ 52.

In the space on the questionnaire where Huff was told to detail any further response he would like to make to the summary judgment motion, he wrote: "I could explane all this in court if allow please." *Resp.* at page 31.

## 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## 3. Discussion

Defendants have now moved for summary judgment. First, Defendants contend there is absolutely no evidence they refused to provide medical care to Huff. Defendants point out each medical request submitted by Huff was reviewed by Nurse Harmon or Dr. Hale. Defendants also

-9-

state that Huff received all medical care ordered by medical personnel.  Second, Defendants maintain

no other constitutional violations are alleged by Huff.

### A.  Denial of Adequate Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and

general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L.

Ed. 2d 1043 (1998)(citation omitted).  "Deliberate indifference to an inmate's serious medical needs

violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield*

*v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).  In this circuit it is now settled law that deliberate

indifference is the appropriate standard of culpability for all claims that detention center officials

have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v.*

*Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle  v.  Gamble*, 429 U.S.

97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both

an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered

[from] objectively serious medical needs and (2) that the prison officials actually knew of but

deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir.

2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).  Additionally, "'[t]he

prisoner must show more than negligence, more even than gross negligence, and mere disagreement

with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at

1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire*

-10-

*v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

Huff had high blood pressure and asthma. The majority of the medical requests Huff submitted dealt with cold symptoms. *See Defts' Ex.* B at pages 1-3, 5, 9, 10-11. In one medical request he stated his cold symptoms were accompanied by chest pain when coughing and high fever.

*Id.* at page 7.  Two other requests dealt with the need for a re-fill of his inhaler.  *Id.* at pages 8 and 13.  For the purposes of this motion, I will assume Huff had one or more serious medical conditions.

I find no evidence of deliberate indifference on Defendants' part.  Each of Huff's medical requests were responded to by Nurse Harmon within a few days of the requests being submitted.  Huff was given a variety of products to remedy or alleviate the various conditions he complained of having.   His medical needs were assessed and he was treated as the jail nurse or doctor concluded the medical evidence dictated.  Huff received the medications ordered by the jail nurse and jail doctor.

On April 16th when Huff ran out of his inhaler he advised detention center personnel that if Primatine tablets were obtained for him it would get him through the night until another inhaler could be obtained.  *Defts' Ex.* B at page 12.  The tablets were obtained and provided to Huff.  *Id.*  An inhaler was ordered the following day.

Throughout his incarceration Huff was provided with his inhaler and allowed to keep it in his cell.  *Resp.* at ¶ 34(B).  He was also seen by Dr. Hale and prescribed Maxzide for high blood pressure.  *Resp.* at ¶ 13(A); *Defts' Ex.* C.

A mere disagreement over the timing and type of  treatment needed is not actionable.  *See Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997)(efforts of prison medical personnel, although not as extensive as those a private health-care provider might have taken, do not reflect deliberate indifference);  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)(prison officials do not violate the Eighth Amendment when, in exercising professional judgment, they refuse to implement inmate's requested course of treatment).  I therefore cannot say, when the evidence is viewed most favorably to Huff,  that there are genuine issues of material fact as to whether Nurse Harmon was deliberately

indifferent to Huff's serious medical needs.   As to the remaining Defendants, Huff concedes all decisions regarding his medical care were made by Nurse Harmon and Dr. Hale. *Resp.* at ¶ 40.   *See Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(prison official not involved in treatment decisions made by medical staff cannot be liable for medical staff's diagnostic decisions).   Accordingly, summary judgment should entered is favor of the Defendants on Huff's claim of denial of adequate medical care.

### B.  Conditions of Confinement

In this case, Huff was a pretrial detainee.  The Court of Appeals for the Eighth Circuit has adopted the same legal standard for detainees that applies to convicted inmates.   *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)(adopting the Eighth Amendment's deliberate indifference standard as the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the

"wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).

Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

### *(1). Tuberculosis Testing*

Huff first contends his rights were violated because the Defendants did screen him for TB by providing a skin test or having any UV lights. Huff has submitted no evidence to suggest that he was exposed to tuberculosis or faced a substantial risk of serious damage to his health. *See e.g., Helling v. McKinney*, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993). In fact, Huff concedes he had no reason to believe he was exposed to tuberculosis. *Resp.* at ¶ 43. Huff made no showing that there were any inmates at the GCDF infected with TB, or that Defendants failed to abate a risk of infection, or that any of the named Defendants acted with a sufficiently culpable state

-14-

of mind.  In sum, there is no genuine issue of fact as to whether Defendants were deliberately indifferent to Huff's existing serious medical needs or that there was an unreasonable risk of serious damage to his future health because of the failure to provide a skin test for TB or failure to provide UV lights in the facility.

### (2) Personal Property

Second, Huff contends his rights were violated when he was not allowed to have a family member bring him undershorts (three), t-shirts (three), socks (three pair), and one thermal shirt.  *See Resp*. at ¶ 41 & ¶ 42(A); *Defts' Ex. F* at pages 1-2.   According to Huff, the inmate rules state that the inmates are allowed to have these items of personal property but the items are not issued by the county.   *Id.*  Huff maintains the rules do not state these items must be purchased through the commissary and cannot be "received." *Id.*      In response, Huff was told the items could be purchased through the commissary.  *Resp*. at ¶ 41 & ¶ 42(B); *Defts' Ex. F* at page 2.  If he did not have money, he was told to see the Chaplain for help.  *Id.*

We find Huff's claim with regard to the personal property fails to rise to the level required to state a claim under the Eighth Amendment.   Huff makes no argument that he did not have adequate clothing. *See e.g., Simmons v. Cook*, 154 F.3d 805 (8th Cir. 1998)(The Eighth Amendment requires prison officials to provide humane conditions of confinement including ensuring that inmates receive adequate clothing.).

Huff has made no showing that he was deprived of the minimal civilized measure of life's necessities or that he was incarcerated under conditions posing a substantial risk of serious harm. *See e.g., Simmons v. Cook*, 154 F.3d 805 (8th Cir. 1998).  Instead, Huff merely objects to Defendants' refusal to allow him to have a relative or someone bring him the items of personal

-15-

property.  This falls far short of showing the existence of a genuine issue of fact as to whether the Defendants acted with deliberate indifference to Huff's health or safety.

### (3).  *Rodent Droppings*

Huff's final claim is that on March 19th at breakfast time there were rodent droppings in his food.  The Eighth Amendment's prohibition against cruel and unusual punishment require prisoners to be provided with meals nutritionally adequate to maintain health.  *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).

Huff makes no argument that the named Defendants were directly responsible for food preparation.  This is the only instance in which Huff found rodent droppings in his food.  *Resp.* at ¶ 44(C).

There is no evidence Huff was routinely served food contaminated with foreign substances, food that was nutritionally inadequate, or food that was prepared in a manner presenting an immediate danger to his health.  *See e.g., Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993)("The fact that the food occasionally contains foreign objects . . . , while unpleasant, does not amount to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985)(same); *Islam v. Jackson*, 782 F. Supp. 1111, 1114-15 (E.D. Virginia 1992)(serving one meal contaminated with maggots and meals under unsanitary conditions for thirteen days was not cruel and unusual punishment, even though inmate suffered symptoms of food poisoning on one occasion).  Assuming for the purposes of this motion that Huff's breakfast meal on March 19th contained rat droppings, I find no claim of constitutional dimension is stated by the presence of this foreign substance in Huff's food on one occasion.

**4. Conclusion**

For the reasons stated, Defendants' motion for summary judgment will be granted (Doc. 15) by a separate judgment that will be entered this same date.

**DATED** this 21st **day of November 2007.**


/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE